NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO K.K.

No. 1 CA-JV 26-0021

FILED 07-09-2026

Appeal from the Superior Court in Maricopa County
No. JD536078
The Honorable Ronee Korbin Steiner, Judge

**AFFIRMED**

COUNSEL

Law Office of H. Clark Jones, LLC, Mesa
By H. Clark Jones
*Counsel for Appellant James W.*

Arizona Attorney General's Office, Tucson
By Marika J. Hodge
*Counsel for Appellee Department of Child Safety*

Maricopa County Office of the Legal Advocate, Phoenix
By Amanda Adams
*Counsel for Appellee K.K.*

---

## MEMORANDUM DECISION

Judge Cynthia J. Bailey delivered the decision of the Court, in which Presiding Judge Daniel J. Kiley and Judge D. Steven Williams joined.

---

**B A I L E Y**, Judge:

¶1        James W. ("Father") appeals the termination of his parental rights to K.K. ("Child").  Because the superior court properly found termination warranted under Arizona Revised Statutes ("A.R.S.") § 8-533(B)(4) and Child's best interests, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Child was born substance-exposed to Nadia K. ("Mother") in late 2024.[1]  The superior court found Child dependent as to Mother due to Mother's drug use and neglect and committed him to the care of the Department of Child Safety ("DCS"), which placed him with a foster family.

¶3        Mother initially did not provide DCS any information on Father, and DCS had to obtain Father's name from other sources.  DCS learned that Father was incarcerated, but without a date of birth or any other identifying information DCS was initially unable to locate him.  DCS eventually determined that Father was convicted of aggravated assault and possession or use of narcotic drugs, began serving a prison sentence in December 2024, and is projected to be released in March 2027.

¶4        In April 2025, DCS located Father and amended the dependency petition to include him.  A DNA test confirmed Father's paternity, and in July 2025 the court adjudicated Father as Child's parent. The court found Child dependent as to Father due to Father's incarceration, set a case plan of family reunification, and ordered DCS to provide Father with visitation and to assess Father's recommended relative placement.

¶5        Weekly virtual visitation with Child began in August 2025 while Father was incarcerated at a prison in Eloy.  From the start, there were disruptions and missed visits due to faulty video connection links sent by the prison.  There was also a scheduling issue after Father was moved

---

[1] Mother's parental rights to Child were previously terminated.  She is not a party to this appeal.

within the prison, though this was resolved after communication between the DCS case manager and the prison. Father also appeared late to or failed to attend several of the scheduled visitation times. Father was transferred to a new correctional facility in January 2026, and his attorney reported that the new facility was much easier to work with.

¶6            In September 2025, DCS successfully requested, over Father's objection, that the case plan be changed to severance and adoption due to the length of Father's incarceration and Mother's lack of engagement with DCS. DCS moved to terminate Mother and Father's parental rights as to Child later that month. As to Father, DCS alleged that his sentence was of such a length as to deprive Child of a normal home under A.R.S. § 8-533(B)(4).

¶7            Father opposed the motion to terminate and moved to grant custody of Child to paternal cousins who lived in Colorado ("Cousins"). Cousins also unsuccessfully moved to intervene in the termination case.

¶8            The superior court held a termination adjudication hearing in January 2026. After the hearing, the court terminated Father's parental rights as to Child on the length-of-incarceration ground. *See* A.R.S. § 8-533(B)(4). The court found DCS made reasonable and diligent efforts to provide Father with appropriate reunification services and found DCS proved by a preponderance of the evidence that termination was in Child's best interests. *See* A.R.S. § 8-533(B). Soon after, the court denied Father's motion to grant custody of Child to Cousins on several grounds, including that Father was no longer a party to the custody proceeding because his rights were terminated.

¶9            Father timely appealed the termination and the denial of the motion for change of custody. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1), (2).

## DISCUSSION

¶10           To terminate parental rights, the superior court must find by clear and convincing evidence that a ground for termination exists under A.R.S. § 8-533(B) and must find by a preponderance of the evidence that termination serves the child's best interests. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149-50, ¶ 8 (2018). On review, we must accept the superior court's factual findings provided they are supported by reasonable evidence and inferences. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶ 30 (2023). We do not reweigh the evidence; instead, we defer to the superior court's determinations on conflicting evidence and witness

credibility. *Id.*; *Alma S.*, 245 Ariz. at 151, ¶ 18. We will affirm the superior court's legal conclusions regarding a statutory basis for termination unless they are clearly erroneous. *Brionna J.*, 255 Ariz. at 478-79, ¶ 31.

**¶11** Father argues the superior court erred by finding termination warranted under A.R.S. § 8-533(B)(4). Section 8-533(B)(4) provides for termination of an incarcerated parent's parental rights "if the [felony] sentence of that parent is of such length that the child will be deprived of a normal home for a period of years." The parent's physical absence does not itself deprive the child of a "normal home." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 476-77, ¶¶ 24-27 (2022). A "normal home" can consist of "a stable and long-term family environment outside a foster care placement, where another parent or a permanent guardian resides and parents the child, and where the incarcerated parent affirmatively acts to maintain a relationship with the child that contributes to rather than detracts from the child's stable, family environment." *Id.* at 477, ¶ 27.

**¶12** Whether the child will be deprived of a "normal home" for years is not subject to a bright-line rule; each case must be considered on its facts. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 29 (2000). The superior court should consider all relevant factors, including, but not limited to:

> (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent [or permanent guardian] to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

*Id.* at 251-52, ¶ 29 (as modified by *Timothy B.*, 252 Ariz. at 477, ¶ 27). No one factor is determinative, and termination may be warranted even if multiple factors favor continuing the parental relationship. *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579, ¶ 9 (2021).

**¶13** Father challenges the superior court's findings under two of the *Michael J.* factors: the degree to which the parent-child relationship can be continued and nurtured; and the availability of a permanent guardian to provide a normal home life. He does not challenge the court's findings

under the other four factors and thus concedes the accuracy of those findings on appeal. *See Britz v. Kinsvater*, 87 Ariz. 385, 388 (1960).

I.      The degree to which the parent-child relationship can be continued and nurtured.

**¶14**         Father contends the court abused its discretion in finding that termination was warranted when DCS failed to make reasonable efforts to provide reunification services. Under the second *Michael J.* factor, DCS must aid in continuing the parent-child relationship by making reasonable efforts to provide reunification services if an incarcerated parent requests those services and providing the services will not endanger the child. *Jessie D.*, 251 Ariz. at 582, ¶ 21. DCS need not provide futile efforts, only those "with a reasonable prospect of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). The court may also consider that incarceration will, as a practical matter, typically preclude all but minimal visitation. *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 451, ¶ 17 (App. 2007).

**¶15**         Father argues that while DCS provided Father with virtual visits, it never offered to provide him with in-person visits or any other reunification services. However, Father objected only once, in October 2025, to a finding that DCS was making reasonable efforts, and the record does not reflect that Father requested that DCS provide in-person visits or additional services. By failing to promptly bring these concerns to the superior court's attention, Father waived the right to argue for the first time on appeal that other services should have been offered. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 18 (App. 2014).

**¶16**         Waiver aside, the court also found that it was reasonable for DCS to offer Father visitation only after paternity was established, that the lapse of time to establish paternity was due to Father's incarceration, and that Father's incarceration prevented him from having access to in-person visits and additional services. Father contends that the virtual visits were inadequate and that DCS refused to work with Father's prison to resolve the scheduling issues. The superior court did acknowledge the visitation issues but found that the scheduling conflicts were mostly the fault of the Arizona Department of Corrections rather than DCS. The court may consider practical problems such as these when analyzing whether the parent-child relationship can be continued and nurtured. *See Christy C.*, 214 Ariz. at 451, ¶ 17 ("The court can certainly consider that incarceration will as a practical matter typically preclude all but minimal visits.").

¶17            The superior court's findings are supported by reasonable record evidence and so we defer to the superior court's conclusions in its role as factfinder. *See Brionna J.*, 255 Ariz. at 478, ¶ 30. The court did not err in finding that DCS made reasonable efforts to provide reunification services to Father.

II.      The availability of a permanent guardian to provide a normal home.

¶18            Father also contends that the superior court failed to consider placing Child in a guardianship with Cousins as an alternative to foster placement. The superior court is required to consider whether a permanent guardianship could provide a child with a "normal home" while a parent is incarcerated. *Timothy B.*, 252 Ariz. at 270, ¶ 28. In making this assessment, the court should consider: "whether another person is willing to be the child's permanent guardian"; whether "the grounds for a permanent guardianship exist, including that a guardianship would be in the child's best interests"; and "whether the incarcerated parent could contribute to rather than detract from the stable, family environment provided by the permanent guardian." *Id.* at ¶ 27.

¶19            Contrary to Father's argument, the court considered and addressed the required factors. Father recommended that Cousins serve as a potential placement, and the court considered Cousins' viability as permanent guardians. Cousins were willing to serve in that role. However, the court found that establishing a guardianship with Cousins would not be in Child's best interests. The court heard and credited evidence that Cousins had substance-abuse, family-relationship, and mental-health concerns that would keep them from being an appropriate placement for Child. The superior court also found that Child had been with his current placement since the beginning of the case, that Child saw the current placement as a parental figure, and that removing Child from the placement would cause him trauma. The court further noted that Father has not cared for or provided for Child's needs during his incarceration. Father had opportunities to involve himself further in Child's life, as DCS provided Father with the opportunity to send Child letters or gifts while Father was incarcerated, but Father did not do so.

¶20            The superior court appropriately considered a guardianship with Cousins as an alternative to foster placement and reasonable evidence supported the court's decision not to establish the guardianship. The court also found that Child's best interests would be served by remaining with his current placement, and as Father does not challenge this finding, we need not address it.

6

¶21        Reasonable evidence supports the superior court's findings on the two *Michael J.* factors Father challenged, and Father raised no arguments on the other four factors. The court therefore did not err in concluding that Father's incarceration would deprive Child of a "normal home" for a period of years. Father does not raise, and therefore has waived, any challenge to the superior court's finding that termination serves Child's best interests. *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577, ¶ 1 (App. 2017).

## CONCLUSION

¶22        We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:        JR